**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

C&A Plus, Inc. d/b/a C&A Pro,
a Minnesota corporation, and
Dale DeWayne Cormican,

Plaintiffs,

v.

Plastic Specialties Manufacturing, Inc.,
a Minnesota corporation,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-1428 ADM/RLE

---

Michael S. Neustel, Esq., Neustel Law Offices, Ltd., Fargo, N.D., and Cheryl Hood Langel, Esq., McCollum, Crowley, Vehanen, Moschet & Miller, Ltd., Minneapolis, MN, appeared for and on behalf of Plaintiffs.

Richard O. Bartz, Esq., Bartz & Bartz, P.A., Edina, MN, appeared for and on behalf of Defendant.

---

## I. INTRODUCTION

On April 3, 2003, the Motion for Summary Judgment [Docket No. 45] of Plaintiffs C&A Plus, Inc. d/b/a C&A Pro ("C&A") and Dale DeWayne Cormican ("Cormican") (collectively, "Plaintiffs"), the Motion for Summary Judgment [Docket No. 40] of Defendant Plastic Specialties Manufacturing, Inc. ("Defendant") and C&A's Motion for Summary Judgment on All of Defendant's Counterclaims [Docket No. 32] were argued before the undersigned United States District Judge. Plaintiffs allege that Defendant infringed U.S. Patent No. 6,086,101 ("the '101 Patent") (Count II) and U.S. Patent No. 6,331,008 B2 ("the '008 Patent") (Count III), and that Defendant misappropriated its trade secrets (Count I). Second Am. Compl. [Docket No. 14]. Plaintiffs move for summary judgment of infringement of the '008 Patent (Count III) and seek a

JUL 2 3 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

permanent injunction. Defendant seeks a declaratory judgment of non-infringement of both the '101 and '008 Patents, and that claims 1 through 3 of the '008 Patent are invalid.

Plaintiffs' Motion for Summary Judgment of claims 1 and 2 of the '008 Patent is granted. Defendant's Motion for Summary Judgment that its skis did not infringe any claims of the '008 Patent, that claims 1 to 3 of the '008 Patent are invalid, and that its skis did not infringe claim 1 of the '101 Patent is denied. Defendant's Motion for Summary Judgment that its skis did not infringe claim 8 of the '101 Patent is granted, and C&A's Motion for Summary Judgment on Defendant's Counterclaims is granted.

## II. BACKGROUND

Cormican is President of C&A and sole listed inventor and patent-holder of the '008 and '101 Patents. Cormican Aff. ¶ 6, Ex. 1 (the '008 Patent). The Patents are for all-plastic snowmobile skis designed to be an improvement over all-metal and combination metal-plastic skis by utilizing an integrated all-plastic saddle and a structure for attaching the saddle to the front suspension of a snowmobile. Id. ¶¶ 9-10. Cormican's '008 Patent invention is an all-plastic ski, molded in one piece, "having the flexibility to withstand impacts during normal use and also maintain contact with the snow, thereby enhancing the operator's steering control." Id. ¶ 11; '008 Abstract. The '008 Patent all-plastic skis are "lighter in weight, more flexible and more durable than conventional skis having a metal saddle arrangement." Cormican Aff. ¶ 11.

The first mold of Cormican's all-plastic ski was made in 1997 by North American Ultra-High ("NAUH"). Pls.' Hr'g Ex. 1 (yellow plastic "C&A PRO" snowmobile ski). Cormican incorporated C&A to market and sell his skis, which were manufactured by NAUH. Cormican Aff. ¶¶ 12-13. "C&A's all-plastic skis immediately became very successful and recognized

throughout the snowmobile industry, particularly within the snowmobile racing community." Id. ¶ 14. In 1998, C&A contracted with Integrated Tooling Systems, Inc. ("ITS"), to create a mold for manufacturing Cormican's ski, which was completed by January 1999. Id. ¶¶ 18-19. In early 1999, after being approached by Defendant, Cormican provided the mold made by ITS to Defendant for manufacturing of the all-plastic skis. Id. ¶¶ 20-21; see Pls.' Hr'g Ex. 2 (green plastic "C&A PRO" snowmobile ski). Cormican alleges he also provided trade secret information to Defendant regarding the creation of recessed apertures within the plastic saddle, and a proprietary drilling tool for that purpose. Id. ¶ 22.

Defendant made changes to the ITS mold for functionality with its compression molding system. Plaintiffs assert that these changes did not materially affect the appearance or mounting structure of the ski comprised of a recessed aperture and flanged bushing structure. Id. ¶ 23. After a period of manufacturing the skis, the relationship between C&A and Defendant deteriorated during 2000 and was terminated in 2001. Id. ¶ 24. Cormican alleges that Defendant continued to manufacture and sell all-plastic skis virtually identical in appearance and structure, using the same mold used to make the C&A skis, without a license or permission from him. Id. ¶¶ 25-26; see Pls.' Hr'g Ex. 3 (blue plastic "ULTRA III FLEX SKI" snowmobile ski).

Cormican was granted the '008 Patent on December 18, 2001, entitled "One Piece Molded Ski Apparatus," and personally retains all ownership rights to the '008 Patent. Bartz Aff. Ex. 1; Langel Aff. Ex. 7 (the '008 Patent); Cormican Aff. ¶ 34. Plaintiffs assert Defendant manufactured, marketed, advertised and sold snowmobile skis infringing upon Cormican's '008 Patent until at least May 2002 and offered skis for sale until October 2002. Cormican Aff. ¶ 30; Neustel Aff. Ex. G. Defendant asserts that no business involving the ski occurred after June 28,

2002, and that no evidence exists of manufacturing or sales later than March 5, 2002. Def.'s Mem. in Supp. of Summ. J. at 13; oral argument.

Plaintiffs seek summary judgment of literal infringement of claims 1 and 2 of the '008 Patent. Defendant seeks a declaratory judgment of non-infringement, asserting that claim 1 of the '008 Patent is ambiguous and that new matter is introduced in the claim elements of claim 3 of the '008 Patent. Defendant argues that the '008 Patent is invalid. Plaintiffs assert that the drawings in the '008 Patent application support the product shape and design, and therefore claim 3 does not include new matter. '008, FIG. 9.

Defendant also asserts that the '101 Patent claim language "dampener means" must be construed to specify a shock absorber. Defendant argues its skis do not utilize shock absorbers, but rather connectors with solid handles absent pivotal connections, and therefore do not infringe the '101 Patent.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment on a patent claim is governed by the same standards as for other types of claims. Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1560-61 (Fed. Cir. 1988). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for

summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

## B. Infringement

Determining whether or not an accused device infringes upon the claims of a patent involves a two-step process. The first step is the proper construction of the relevant patent claims asserted ("claim construction") and the second step is the determination of whether or not the accused product infringes the asserted claims as properly construed. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996); Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd 517 U.S. 370 (1996).

### 1. Step One: Claim Construction

Claim construction, the interpretation of the patent claims that define the scope of a patentee's rights under a patent, is a matter of law exclusively for the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-971 (Fed. Cir. 1995), aff'd 517 U.S. 370 (1996).[1] The language of the claims is the starting point for all claim construction analysis, because it

---

[1] Federal Circuit decisions on claim construction have "national stare decisis effect." Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998).

frames and ultimately resolves all issues of claim interpretation. Robotic Vision Sys., Inc. v. View Eng'g, Inc., 189 F.3d 1370, 1375 (Fed. Cir. 1999); Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir. 1997). Claims must be read in view of the specification of which they are a part. Markman, 52 F.3d at 979. The description of the invention given in the specification may serve as a dictionary to define terms used in the claims. Id. A patentee acting as his own lexicographer[2] must clearly define any special terms in the specification. Id. at 980.

A court should also consider the patent's prosecution history, as it is "of primary significance in understanding the claims." Id. Prosecution history should be used to understand the language in the claims, but not to enlarge, diminish or vary the claim limitations. Id.

Claims speak to those skilled in the art. Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001); Electro Med. Sys., S.A. v. Cooper Life Scis., Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994). When the meaning of words in a claim is disputed, the specification and prosecution history can provide relevant information about the scope and meaning of the claim. Electro, 34 F.3d at 1054. However, "claims are not to be interpreted by adding limitations appearing only in the specification." Id. (emphasis added); Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865 (Fed. Cir. 1989) ("References to a preferred embodiment [in a specification] are not claim limitations."). Particular embodiments appearing in a specification are not read into claims if the claim language is broader than the embodiment. Electro, 34 F.3d at 1054. Therefore, a specification must require a limitation in order to read the limitation into

---

[2] While patentees can define terms of a claim contrary to their ordinary meaning, "nothing in any precedent permits judicial redrafting of claims." Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 799 (Fed. Cir. 1990); Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999).

the claims. Id. "If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985). "It is the claims that measure the invention." Id. (emphasis in original).

The interpretation of a term can ultimately be determined and confirmed only with "a full understanding of what the inventors actually invented and intended to envelop with the claim." Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Id. A claim construction does not become persuasive by following a certain rule, but by defining terms in the context of the whole patent. Id. The intrinsic evidence of record (the claims, the specifications, and the prosecution history) is the most significant source of the legally operative meaning of disputed claim language, and in most situations will resolve any ambiguity in a disputed claim term. Vitronics, 90 F.3d at 1582. In such circumstances, "it is improper to rely on extrinsic evidence." Id.

However, "Vitronics does not prohibit courts from examining extrinsic evidence, even when the patent document is itself clear." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308 (1999). "Rather, Vitronics merely warned courts not to rely on extrinsic evidence . . . to contradict the meaning of claims discernable from . . . the intrinsic evidence." Id. (emphasis in original); Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998) (disapproving of using extrinsic evidence to arrive at a claim construction "clearly at odds with" the claim

construction mandated by the intrinsic evidence). Thus, while "reliance" on extrinsic evidence is only proper when claim language remains ambiguous after consideration of the intrinsic evidence, it is "entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction . . . is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." Pitney Bowes, 182 F.3d at 1308.

**a. The '008 Patent**

The '008 Patent claims address the recessed aperture with flanged bushing used to connect the ski to a snowmobile. The '008 Patent is for a one-piece molded ski apparatus. The ski is comprised of a plastic body 12, "constructed entirely from Ultra High Molecular Weight Polyethylene" ("UHMW") as one piece including the "attachment saddle" facilitating the attachment for mounting the ski to a snowmobile. '008, col. 1: 6-10; See '008, FIG. 1 (attached).[3] The saddle vertical mount plates 18 extend upward and form the attachment point for the pre-load bar 20 and for attachment to a snowmobile. Id. col. 2: 18-21, 36-41, 46. The ski is molded flat, but has a "pre-load function" provided by "bending the forward most portion of the ski body 12 . . . in an upward fashion." Id. col. 2: 26, 31-34. The front of the ski is held in this bent-up position by the "pre-load bar," which connects to the front tip of the ski at the "pre-load bar front mount 38" and to the saddle vertical mount plates 18. Id. col. 2: 31-46; see '008, FIG. 1 (22, 24); FIG. 8 (29); FIG. 9 (25). This arrangement "forces the ski tip to be held in an upwardly curved position." Id. col. 2: 48-49. The amount of pre-load, or curvature, placed on the ski body is varied by means of the variable pre-load bar mount holes 24. Id. col. 2: 50-52,

[3] All figures cited are attached.

col. 4: 65-67.

Plaintiffs assert a unique feature of the invention is the pivotal mounting of the pre-load bar to the ski. The pre-load bar 20 is "pivotally attached" to the ski saddle at the rear mount bolt 22. Id. col. 4: 55-57. The pre-load bar 20 is attached to the front tip of the ski via a "concave depression" called the mount socket 50. See '008, FIG. 6. The corresponding convex surface at the tip of the pre-load bar 20 is the "mount ball 48," attached via the pre-load bar front mount hole 46. Id. col. 5: 51-60; FIG. 6. This concave/convex fitting is intended to allow pivoting at the front of the ski. Plaintiffs assert this design does not include a necessary limitation for a shock absorber.

Plaintiffs also assert a unique feature of the invention is the recessed aperture with flanged bushing utilized to attach the ski to a snowmobile. Figure 9 shows that the ski cradle of a snowmobile is mounted to the vertical mount plates 18 with ski mount bolt bushings 29, 70, 72 fitting into the bolt holes 25. Id. col. 5: 31-35; See FIG. 9. The ski mount bolt holes 25 are shown in figure 9 to be recessed, and "may have various cross sectional shapes including but not limited to circular and rectangular." Id. col. 5: 44-45, FIG. 9. The diameter of the first portion 62 of the concentrically recessed bolt hole 25 is larger than the first portion 60. FIG. 9. The recessed aperture with flanged bushing where the ski mount bolt bushings 29 insert into the bolt holes 25 is intended to prevent breakage.

Two relevant patented features of Cormican's invention, the recessed aperture with flanged bushing, protected by the '008 Patent, and the pivotally mounted pre-load bar, protected by the '101 Patent, are in dispute. Defendant asserts that neither the recessed aperture with flanged bushing, nor the pivotal mounting of the pre-load bar to the ski, are unique. In its

argument for non-infringement of the '101 Patent, Defendant argues that the pre-load bar is required by the '101 claim language to be a shock absorber.

The '008 Patent claims[4]:

1. A one piece base, adjustable flex ski for use on a vehicle, said ski comprising:

   a molded one piece flexible elongate ski having an upper surface, a bottom surface, and a first portion and a second portion extending upwardly from said upper surface, said first portion and said second portion are spaced apart from each other;

   a first aperture within said first portion;

   a second aperture within said second portion concentric with said first aperture and opposite said first aperture;

   a first bushing member positioned within said first aperture;

   a second bushing member position[ed] within said second aperture, wherein said bushing members receive a pin member, wherein a mount nut is secured to an end of said pin member for securing said ski to said vehicle; and

   wherein said first aperture and said second aperture each have a first portion having a first diameter and a second portion having a second diameter wherein said second diameter is larger than said first diameter, and wherein said first bushing member and said second bushing member each have a first segment corresponding to said first portion and a second segment corresponding to said second portion of said apertures, wherein said second segment of said first bushing member is opposite said second segment of said second bushing member.

2. The one piece base ski of claim 1, wherein said first aperture and said second aperture have a circular shape, and wherein said first bushing member and said second bushing member have an outer circular shape corresponding to said apertures.

3. The one piece base ski of claim 1, wherein said first aperture and said second aperture have a rectangular shape, and wherein said first bushing member and said second bushing member have an outer rectangular shape corresponding to said

[4] A Certificate of Correction of claim 1 of the '008 Patent was granted on March 5, 2002. See Bartz Aff. Ex. 2. The language cited reflects the corrected claim language.

apertures.

'008, claims 1-3.

Defendant asserts that the '008 Patent is invalid, arguing that claim 1 is ambiguous, that claims 2 and 3 are not supported by the specification, and that claims 1 and 3 add new matter.[5] Def.'s Mem. in Opp. at 3. "No amendment shall introduce new matter into the disclosure of the invention." 35 U.S.C. § 132 (2003). Patents issued by the United States Patent and Trademark Office are presumed to be valid. 35 U.S.C. § 282 (2003). Defendant has the burden of proving invalidity by clear and convincing evidence. Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1036 (Fed. Cir. 2001).

No specific claim language is in dispute regarding the '008 Patent, therefore the claims are construed in accordance with their plain and ordinary meaning, as used in the specification and as illustrated in the figures. Reading the claims as stated after the March 5, 2002 Certificate of Correction and in light of the specification, as the Court must, claims 1-3 are clear and unambiguous. The language of claims 1 and 2 claim the design and placement of the mounting apertures with recessed portions surrounding the mounting apertures along with flanged bushings that are received within the mounting apertures. This design and placement is illustrated in figure 9. The specification articulates the cross sectional shapes identified in claims 2 and 3, circular and rectangular, respectively. '008, col. 5: 44-45. The September 5, 2001, Amendment

---

[5] Plaintiffs move to strike the March 27, 2003 submissions of the Defendant. A Memorandum of Law and an expert report relating to Defendant's claim that new matter invalidated the '008 Patent were filed after the Court's March 15, 2003 deadline for dispositive motions. See April 9, 2002 Scheduling Order [Docket No. 8]. As stated on the record at the April 3, 2003 hearing, material received after the deadline will not be considered. Plaintiffs' Motion to Strike is granted.

to the patent application was not rejected by the patent examiner as adding new matter. The Amendment clarified the disclosure by describing and adding reference numerals to components shown in figures 8 and 9 of the original application. Defendant argues that the two-dimensional picture of figure 9 does not illustrate the diameter of hole 25 or bushing 29. It does, however, clearly picture the shape of hole 25 and bushing 29 such that the diameter of the outermost part of each is unmistakably larger than that of the innermost part. Accordingly, neither claims 1, 2 nor 3 add new matter.

Defendant asserts further that an additional individual, Larry Altringer ("Altringer"), assisted in the design of the mold for the '008 Patent ski and was not credited on the '008 Patent. See Altringer Dep. at 54. Altringer testified that he and Cormican "worked together on the design of the ski," but could not identify particular design features attributable to himself. Id. No evidence establishes that Altringer invented the recessed apertures of the ski protected by the '008 Patent. Defendant has not produced clear and convincing evidence of the invalidity of the '008 Patent on this basis.

Defendant alleges the patented ski was in public use for a year prior to the '008 Patent issuing. See 35 U.S.C. § 102(b) (2003) (stating that a person is not entitled to a patent if the invention was in public use or on sale in this country more than one year prior to the date of the patent application). Cormican admits that a mold of his ski existed in 1997. Cormican Aff. ¶ 12. Cormican also stated that a "working prototype" of the ski was created before August 1, 1997. Cormican Aff. of May 4, 2001 ¶ 4. Cormican admits to sales of the ski after January 1, 1998. Id. ¶ 5. No other evidence establishes sales prior to January 1, 1998. The patent application for the '008 Patent was filed on August 7, 1998. Clear and convincing evidence does not establish the

public use of '008 patented skis prior to August 7, 1998.

Finally, Defendant argues that the '008 Patent is invalid because the use of a common bushing is obvious in light of United States Patent 4,134,175 ("the '175 Patent"), issued January 16, 1979. Bartz Aff. Ex. 20. A patent may not be obtained if the invention only differs from prior art such that the "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103(a) (2003). While figures 3 and 4 of the '175 Patent illustrate a bushing with a "complementary contoured flange recess," this process has not been shown to have been used in plastic prior to the '008 Patent, as the patent examiner found in granting the '008 Patent. '175, Abstract. Defendant cites to numerous patents for skis having UHMW bodies, patents including bushings in non-plastic skis, and the use of recessed holes with bushings generally. Def.'s Mem. in Opp. at 13. Defendant then relies on the report of Steven Bruns ("Bruns") to support its argument that flanged bushings are well known machine designs. S. Bruns Report at 3 (Bartz Aff. Ex. 7). However, Bruns admits that he was not an expert in the area of snowmobile skis at the time of the '008 Patent application, and that he did not know he was a "technical expert" for this case. S. Bruns Dep. at 229-34 (Langel Aff. Ex. 9). Such evidence does not surmount the clear and convincing standard to invalidate the '008 Patent for obviousness. See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1365 (Fed. Cir. 2001) (stating that because every patent is presumed valid, the "very existence of the patent" establishes validity upon the failure of the alleged infringer to identify persuasive evidence of invalidity).

Moreover, on February 7, 2003, the United States District Court for the District of North Dakota had occasion to examine the '008 Patent in a related case and acknowledged its validity

by enjoining Defendant Pride Solutions from inducing infringement and manufacturing or selling the Ultra III Flex ski. C&A Plus, Inc., d/b/a C&A Pro and Dale DeWayne Cormican v. Pride Solutions, LLC, Civil No. A3-02-118, slip op. at 8-10 (D.N.D. Feb. 7, 2003) (Pls.' Ex. C). Defendant has not offered sufficient evidence to overcome the presumption of validity of the '008 Patent.

**b. The '101 Patent**

The '101 Patent claims relate to the structure of the pre-load bar. Defendant moves for partial summary judgment that its skis do not infringe any claims of the '101 Patent. The parties dispute the construction of the term "dampener means" from claim language in the '101 Patent.

Like the '008 Patent, the '101 Patent discloses an "adjustable flex ski apparatus" containing a one-piece UHMW plastic ski body 12 with an upwardly extending saddle 16. '101, FIG. 1. The ski is given a pre-load function, as in the '008 Patent. The '101 Patent invention ski "is held in [a pre-load] position by the use of the gas pre-load shock or dampener." '101, Abstract. The dampener "extends pivotally rearward from the tip of the ski to the ski saddle on the upper center surface of the ski body." Id. "The adjustability of the ski body can also be enhanced by the use of internally adjustable gas shocks . . . ." Id.

The purpose of the '101 Patent invention is to avoid problems with "overall rigid" skis by providing a ski that "works to absorb bumps during riding." '101, col. 1: 60, col. 2: 42-43. That is, "the primary objective of the ['101 Patent] invention [is] to provide a method of making a resilient and flexible ski that has an adjustable flex." Id. col. 2: 51-54. A further objective is "to provide a means of dampening vibration and flex as [the ski] travels through rough terrain." Id. col. 2: 60-63.

As shown in figure1, the front portion of ski is held in an upward fashion by use of a "gas pre-load shock 18 (. . . generally known as dampeners or shock absorbing dampeners)." Id. col. 4: 33-35. The construction of the term "dampener means," used in the claim language to specify the gas shock 18, is the focus of the controversy. Use of the term "means" creates a presumption that the inventor used the term to trigger 35 U.S.C. § 112, ¶ 6.

**i. Application of § 112, ¶ 6**

A claim element expressed in means-plus-function terminology is interpreted under 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (2001). Whether or not a claim limitation falls under § 112, ¶ 6 is a question of law. Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998).

A claim element containing the word "means" that recites a function is presumed to be a means-plus-function element subject to § 112, ¶ 6. Envirco Corp. v. Clestra Cleanroom, Inc., 209 F.3d 1360, 1364 (Fed. Cir. 2000). However, this presumption is overturned "if the claim itself recites sufficient structure to perform the claimed function." Id. If a claim does not qualify for § 112, ¶ 6 treatment, "it is not limited to the structure corresponding to the claimed function as 'described in the specification and equivalents thereof.'" Id. at 1365 (citing 35 U.S.C. §112, ¶ 6). In such a case, the specification merely informs the claim construction, while the claim language itself governs the meaning of the claim. See id.

The '101 Patent has two independent claims, claims 1 and 8. Claim 1 of the '101 Patent claims:

> 1. An adjustable flex ski for use on a vehicle said ski comprising:
>
> . . .
>
> A dampener means having an upper and lower portion with said upper portion pivotally connected to said first connection means and said lower portion pivotally connected to said second connection means said dampener means being connected so as to upwardly bend said tip of said ski so as to place an upward curving pre-load on the ski between said first and second connection means, such that when said dampener means is disconnected from said ski said ski returns to a substantially flat section.

'101, claim 1 (emphasis added). Claim 8 of the '101 Patent claims:

> 8. An adjustable flex ski for use on a motorized vehicle that travels on snow and ice said ski comprising:
>
> . . .
>
> A shock absorber dampener means having an upper barrel portion and a lower rod slidable in said barrel, such that said shock absorber has a variable length between an upper extended limit and a lower contracted limit with said upper barrel pivotally connected to said first connection means and said lower rod pivotally connected to said second connection means said shock absorber is of such a length such that it holds the front portion of said ski in an upward pre-load and curved position, with said shock absorber at its upper extended limit so as to place said upward curving pre-load on said ski between said first and second connection means, such that when said dampener means is disconnected from said ski said ski returns to a substantially flat section.

'101, claim 8 (emphasis added).

The "dampener means" and the "shock absorber dampener means" of claims 1 and 8 of the '101 Patent express means for holding the ski in a pre-load position **and absorbing force and impact energy**. See '101, col. 3: 27-29 ("[T]he energy created by this impact is absorbed by

the flexible ski body in the pre-load area of the ski and by the gas shock."), col. 5: 2-3 ("[When] the tip of the ski body 12 is forced upward, the gas pre-load shock compresses and absorbs the force."). Thus, each claim element is a means-plus-function element.

**ii. Means-Plus-Function Analysis under § 112, ¶ 6**

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (2001). Claim construction of a § 112, ¶ 6 limitation, referred to as a means-plus-function limitation, requires (1) identification of the claimed function and (2) identification of the corresponding structure in the specification which performs the recited function. IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429-1430 (Fed. Cir. 2000); Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257 (Fed. Cir. 1999). These identifications are both questions of law, while whether an accused device performs the identical function "or an equivalent thereof" is a question of fact. IMS, 206 F.3d at 1430. A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures. Micro Chem., 194 F.3d at 1258. The scope of the claim is not expanded by § 112, ¶ 6; rather, § 112, ¶ 6 "operates to cut back on the types of means which could literally satisfy the claim language." Johnston v. IVAC Corp., 885 F.2d 1574, 1580 (Fed. Cir. 1989) (emphasis in original) (holding that § 112, ¶ 6 "restricts the scope of the literal claim language"). However, means-plus-function claims are not limited to a particular means set forth in the specification, because they are construed to cover equivalents as well. D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1574 (Fed. Cir. 1985).

Plaintiffs assert the '101 Patent protects the "unique all-plastic ski design along with the dampener means for retaining the front portion of the ski in a curved manner from a normally straight one," where the dampener means need not be a shock absorber. Mem. in Opp. at 6. "Plaintiffs admit that Claim 8 is not infringed upon by Defendant's ski[,] as Claim 8 has the limitation of a 'shock absorber dampener means having an upper barrel portion and a lower rod slidable in said barrel . . . .'" Mem. in Opp. at 26. Accordingly, Defendant's Motion for Partial Summary Judgment that its skis do not infringe claim 8 of the '101 Patent is granted.

However, Plaintiffs assert that claim 1 of the '101 Patent does not contain the same limitation, and protects against any infringing product containing a dampener means having an upper and lower portion, regardless of whether or not it also functions as a shock absorber. Id.

**a. The Function**

The function of the claim element "dampener means" is to place an upward bend in the tip of the ski thereby maintaining the pre-load position, and to absorb force and impact energy. See '101, claim1, col. 3: 27-29 ("[T]he energy created by this impact is absorbed by the flexible ski body in the pre-load area of the ski and by the gas shock."), col. 5: 2-3 ("[When] the tip of the ski body 12 is forced upward, the gas pre-load shock compresses and absorbs the force.")

**b. The Structure**

The corresponding structure disclosed in the patent specification is a dampener with an upper and lower portion each pivotally connected to the ski's attachment points. This structure is disclosed in the specification as being the gas pre-load shock 18. '101, FIG. 1, col. 4: 33-35 Because this is a means-plus-function claim element, the patent protection is limited to the structure corresponding to the claimed function as described in the specification, and equivalents

thereof. Envirco, 209 F.3d at 1365 (citing 35 U.S.C. §112, ¶ 6). Defendant asserts that a dampener means of the shock absorber type is required. Plaintiffs contend that although the preferred embodiment shows a shock absorber, and concede claim 8 of the '101 Patent requires a shock absorber, claim 1 does not require the dampener means to be a shock absorber.

The specification is replete with references to the "dampener means" serving the function of absorbing shock. The "present invention" is described as functioning to absorb energy from impacts with obstacles "in the pre-load area of the ski and by the gas shock." '101, col. 3: 27-30. This process is described as "the impact absorbing motion," and the dampener means is described as facilitating the plastic ski's "ability to flex." Id. col. 3: 29-30, 33. Figure 7 shows prior art including a rigid connector holding a ski in an upwardly curved pre-loaded position, while figure 8 is shown to contrast the "difference of the manner in which it interacts with severe bumps or other obstacles" of the patent invention. Id. col. 4: 1-3. The nature of the connector being a shock absorber is critical to the performance of the invention as it is described. See id. col. 2: 42-43 (stating that "it is desirable to supply a ski that works to absorb bumps during riding"), 60-62 (stating that an "objective of the present invention [is] to provide a means of dampening vibration and flex as it travels through rough terrain"). The impact absorbing characteristic is consistent with the language of the specification describing the dampener means as doing more than simply placing an upward bend in the ski by means of a rigid connector. The dampener means, therefore, incorporates the function of absorbing shock. Because this limitation is required by the specification, it must be construed to be a part of the "dampener means" structure claim element of claim 1. See Electro, 34 F.3d at 1054.

**2. Step Two: Analysis**

In the second step in the analysis, the properly construed claims are compared to the alleged infringing device to see if the accused device contains all the limitations, either literally or by equivalents of, in the claimed invention. Vitronics, 90 F.3d at 1582. Application of the claims to the device, for both literal infringement and infringement under the doctrine of equivalents, is a question of fact.[6] Lockwood v. American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995).

"To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Southwall, 54 F.3d at 1575. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997). In clarifying the doctrine of equivalents, the Supreme Court stated:

> What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an

---

[6] In Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997), the Supreme Court stated that it "declines to consider whether application of the doctrine of equivalents is a task for the judge or for the jury, since resolution of that question is not necessary to answer the question here presented." Id. at 21. In that case, the en banc Federal Circuit held that the question of equivalence is for the jury to decide. Id.

ingredient not contained in the patent with one that was.

Id. at 24-25 (internal citation omitted). "Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." Id. at 29.

**1. The '008 Patent**

Claim 1 of the '008 Patent defines the ski as having the bushing members "positioned within" the recessed holes in the mount members. '008, claim 1. Defendant argues that because it made and sold the skis as replacement parts intending the bushings to be inserted by the user rather than already inserted into the recessed holes, it cannot literally infringe claims 1 and 2. See Husky Injection Molding Sys., Ltd. v. R&D Tool & Eng'g Co., 291 F.3d 780, 789 (Fed. Cir. 2002) (holding that "selling replacement parts cannot constitute contributory infringement"). In other words, Defendant asserts that it must have "assembled these parts on the skis" prior to sale in order to directly infringe claims 1 and 2 of the '008 Patent. Def.'s Mem. in Opp. at 7.

However, at issue in Husky were "readily replaceable parts." Husky, 291 F.3d at 788. The object manufactured and marketed by Defendant here is not a "replaceable part" of the '008 Patent device, but is rather the entire plastic molded ski, lacking only the easily replaceable parts (bushings, washers, nuts and bolts) readily purchased at any hardware store. Cormican did not invent the nuts, bolts, washers and bushings. No authority suggests that Defendant can avoid infringement by simply omitting to assemble standard bolts and bushings to a patented molded product. The ski is the same product whether the bushings and bolts are positioned within the ski apertures as required for use, or sitting on a table next to the ski. To utilize Defendant's ski requires mounting it to a snowmobile using the same type of bushings that the '008 Patent ski

descibes as being "positioned within" the apertures in claim 1. The ski sold by Defendant included assembly instructions for the user who purchased the appropriate bolts (26), nuts (27), washers (33) and bolt bushings (29). Pls.' Ex. D; see '008, FIG. 9. Defendant asserted at oral argument that it provided these "standard bushing materials" for sale as well, for $28, if the purchaser wished to purchase them.

The Defendant's ski, Pls.' Hr'g Ex. 3, contains every claim element of claims 1 and 2 of the '008 Patent. It is a molded one piece flexible elongate ski with upper and bottom surfaces, and spaced upwardly extending portions, as described in claim 1. It has a first aperture with first portion and a second concentric aperture opposite the first, where first and second bushing members are positionable within the apertures as shown in figure 9, and where the aperture diameters are increasing in size, all exactly as described in claim 1. Defendant's allegedly infringing product, Pls.' Hr'g Ex. 3, and Cormican's '008 Patent ski, Pls.' Hr'g Ex. 2, are identical in appearance in all respects except for the color, the numerals and letters printed on the skis and other minor, non-essential molding differences. In fact, the skis appear, as Plaintiffs suggest, to have been made with the exact same mold, with only inconsequential minor molding changes. Defendant's ski literally infringes upon claim 1 of the '008 Patent. Defendant's product has apertures with a circular shape as described in claim 2. Accordingly, Defendant's ski literally infringes upon claim 2 of the '008 Patent.

The remaining issue is whether or not Defendant made or marketed the accused skis subsequent to its notice of the '008 Patent, the effective date of which is March 5, 2002. Defendant avers it has been out of business since June 30, 2002 (Def.'s Mem. in Opp. at 15) and that no evidence shows it manufactured or sold skis after March 5, 2002 (oral argument).

Plaintiffs allege that Defendant offered for sale the skis subsequent to March 5, 2002, and that it operated a sales website until October 2002. Neustel Aff. Ex. G (October 10, 2002 printouts of Defendant's www.flexski.com website offering the ULTRA III Flex Ski for sale). Defendant's Answers to Interrogatories state that Defendant "terminated all activities and business in May 2002." Answer to Interrogatories No. 3, 4, 6 (Langel Aff. Ex. 14). Defendant's June 28, 2002 Management/Consulting Agreement with Pride Solutions, Inc., requiring the operation and management of Defendant for 120 days after June 28, states that Defendant closed its doors on approximately June 14, 2002. Neustel Aff. Ex. H. Asmussen, an employee of Defendant, also testified that Defendant was operational until June 2002. Asmussen Dep. at 82-83 (Neustel Aff. Ex. J). Accordingly, the evidence establishes Defendant remained in business subsequent to March 5, 2002. Plaintiffs' Motion for Summary Judgment of infringement of claims 1 and 2 of the '008 Patent is granted. Defendant's Motion for Partial Summary Judgment that its skis do not infringe any claims of the '008 Patent, and that claims 1 to 3 of the '008 Patent are invalid, is denied.

**2. The '101 Patent**

Plaintiffs assert that Defendant's product contains every element of claim 1 of the '101 Patent, or infringes under the doctrine of equivalents. Defendant claims that its accused product uses a "one-piece rigid handle" to accomplish the upwardly bent pre-load on the plastic ski, such that it does not absorb shock and is not connected via pivotal connections. Def.'s Mem. in Supp. at 8 (citing FIG. 1 of U.S. Patent No. D467,840 (Bartz Aff. Ex. 3)).

The connector bar of Defendant's product looks markedly different than the straight gas pre-load shock 18 of the '101 Patent invention, but is very similar to the pre-load bar 20 of the

'008 Patent invention. '101, FIG. 1; '008, FIG. 1. Defendant asserts its connector is a one-piece rigid handle that is different from either of Plaintiffs' handles by being rigid and not a shock absorber. Plaintiffs' infringement argument is that Defendant's handle functions as a connector with upper and lower portions holding the ski in a bent pre-load position, which is effectively the same as the pivotally mounted dampener means of the '101 Patent. Defendant's product does not literally infringe the '101 Patent. However, whether or not Defendant's ski infringes this element of the '101 Patent under the doctrine of equivalents remains a question of fact for the jury to decide. See Warner-Jenkinson, 520 U.S. 17; IMS, 206 F.3d at 1430.

Defendant's ski has the connector bar connected to the front of the ski via a "concave depression" identical to the mount socket 50 of the '008 Patent. See '008, FIG. 6. The corresponding convex surface at the tip of the Defendant's connector bar is also identical to the "mount ball 48," attached via pre-load bar front mount hole 46, of the '008 patent. Id. col. 5: 51-60. This is different than the pivotal connection of the "front shock mount 38" disclosed in the '101 Patent such that literal infringement is averted. Again, whether or not Defendant's ski infringes this element of the '101 Patent under the doctrine of equivalents remains a question of fact.

Likewise, the "rear shock pivot mount 37" of the '101 Patent is not literally present in the Defendant's product, which instead uses a "lost motion connection" to the upright flanges that is "slidably located." Def.'s Mem. in Supp. at 6. Plaintiffs argue that the sliding connection serves the same function as a pivotal connection. Because this connection is not a "pivotal connection," Defendant asserts that the connection does not infringe claim 1. Id. While this claim element is not literally infringed, whether or not Defendant's ski infringes this element under the doctrine of

equivalents remains a question of fact.

Because fact questions remain as to whether or not Defendant's product infringes the '101 Patent under the doctrine of equivalents, Defendant's Motion for Partial Summary Judgment that its skis did not infringe claim 1 of the '101 Patent is denied.

**C. Counterclaims**

Defendant asserts four counterclaims. The first concerns the inventorship and ownership of the design of the '008 and '101 Patents for snowmobile skis made by Defendant for Plaintiffs. Defendant also seeks an injunction prohibiting Plaintiffs from marketing the skis. Defendant alleges that it designed the ski for which Cormican obtained two patents. Def.'s Mem. in Opp. at 2. Cormican entered into a Nondisclosure Agreement with Defendant on October 20, 1998. Langel Aff. Ex. 15. The Nondisclosure Agreement provided "trade secrets, confidential information or proprietary concepts . . . received or learned by [Plaintiffs] relating to the operation of [Defendant] Corporation shall be deemed the exclusive property of [Defendant]" Id. ¶ 1; see also Ans. to Second Am. Compl. and Countercls. ("Defendant's Answer") ¶ 48 (Bartz. Aff. Ex. 5). Defendant alleges it designed a ski in May 1999 and made a mold for manufacturing the UHMW ski. Id. ¶¶ 49-50, 53; S. Bruns Dep. at 106. Defendant offers the testimony of its officer and principal shareholder, Mark W. Bruns, that Defendant made several changes to Cormican's original design. Def.'s Mem. in Opp. at 2 (citing M. Bruns Dep. at 57-58, 122 [not included with any affidavit]). Defendant argues that the changes fall under the confidentiality agreement. Plaintiffs argue that the confidentiality agreement does not convert Cormican's design ideas into Defendant's property.

The Nondisclosure Agreement also states that "[n]one of the obligations of [the

Agreement] shall apply to any information which . . . is known by [Plaintiffs] prior to disclosure to it by [Defendant]." Nondisclosure Agreement ¶ 3. The language of the Nondisclosure Agreement does not support Defendant's claims. The Nondisclosure Agreement does not convert Cormican's ski design to Defendant's ownership under its terms. Accordingly, any ideas or designs brought by Plaintiffs to Defendant when seeking the manufacture of its skis remain the property of Plaintiffs. No evidentiary support is provided to establish that Defendant created the snowmobile skis for which Cormican holds the '008 and '101 Patents. The changes made by Defendant to the mold used for the ski production were made subsequent to the design of the ski and relate to the type of thermal compaction mold operation utilized, not to the design of the ski itself. Wilson Aff. ¶ 9. Defendant's counterclaim seeking to enjoin Plaintiffs from selling the skis to which Cormican owns two Patents is denied.

Defendant's second counterclaim seeks a declaratory judgment of the invalidity of the relevant patents and for non-infringement. Defendant claims that Plaintiffs' allegations of infringement of the '101 Patent are a "sham." Def.'s Mem. in Opp. at 5. Defendant also asserts that the '008 Patent is invalid for containing new matter, and for obviousness. Id. These bases are the same as the defenses asserted by Defendant in defending Plaintiffs' Motion for Summary Judgment, and in support of it's own Motion for Summary Judgment. These arguments have been decided on the merits as discussed above.

Defendant also claims that Cormican threatened snowmobile ski dealers with inclusion in this lawsuit if they purchased Defendant's skis. Bartz Aff. Ex. 12; S. Bruns Dep. at 214, 216-20, 222-23, 229, 296, 297. Plaintiffs argue that the Noerr-Pennington doctrine protects their First Amendment right to bring suit in state and federal courts. See Eastern R.R. President's

Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965). Under the Noerr-Pennington doctrine, the act of filing a lawsuit is immune from antitrust or tort liability "unless it is found to be a mere sham intended to disguise tortious or anti-competitive liability." Datascope Corp. v. Vascular Solutions, Inc., 165 F. Supp. 2d 933, 936 (D. Minn. 2001). This "sham exception" only applies if the claims asserted are "clearly baseless." Id. That is not the case here. However, Defendant also argues that Cormican sent letters to dealerships threatening suit and that the Noerr-Pennington doctrine does not apply to that context. However, Steven Bruns testified that the only evidence supporting this claim is "verbal," and that he was unwilling to disclose who told him about the alleged letter. S. Bruns Dep. at 214-15. This evidence is insufficient to establish that the Noerr-Pennington doctrine does not apply. Defendant also has not shown "clear and convincing evidence of bad faith litigation, proving that plaintiff had actual knowledge that the patents-in-suit were invalid before bringing suit." Lund Inds. v. Westin, Inc., 764 F. Supp. 1342, 1346 (D. Minn. 1990). For the reasons stated above, Defendant's second counterclaim is dismissed.

Defendant's third counterclaim asserts that Plaintiffs have violated the Lanham Act § 43(a), 15 U.S.C. § 1125. Defendant claims this is a false advertising claim based upon a misleading representation of facts. Def.'s Mem. in Opp. at 9. Defendant alleges that Cormican orally and by letter advised sellers and customers not to buy Defendant's products. Id.

Liability under the Lanham Act requires the "use in commerce" of a protected trademark. DaimlerChrysler AG v. Bloom, 315 F.3d 932, 936 (8th Cir. 2003). No allegation of Plaintiffs having used any trademark belonging to Defendant has been made. See Defendant's Answer ¶¶ 72-85. Accordingly, Defendant's Lanham Act counterclaim must be dismissed.

Defendant's fourth counterclaim asserts claims of deceptive trade practices, under the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.43. Defendant's Answer ¶ 87. Defendant asserts Plaintiffs have "disparaged and made misleading oral and written statements in commerce concerning [Defendant]." Id. ¶ 90. Plaintiffs argue the statutory requirements are similar to those of the Lanham Act, and thus this counterclaim rises and falls with counterclaim three. Defendant's counterclaim states no evidentiary basis for its claims, but relies on "information and belief." Id. Bruns made hearsay allegations of unidentified parties receiving threats from Cormican. S. Bruns Dep. at 214-15. Defendant relies also on a May 10, 2002 letter from Cormican to various distributors stating that C&A Pro was granted the '008 and '101 Patents and stating:

> C&A has taken, and will take, steps to protect its valuable patent rights. Specifically, C&A has filed a lawsuit for patent infringement against [Defendant]. The case is now pending in the United States District Court for the District of Minnesota and alleges that [Defendant] has infringed C&A's patent rights and has engaged in other acts of unfair competition. The lawsuit seeks an injunction prohibiting further sales of infringing skis and damages in an unspecified amount.

Langel Aff. Ex. 22. The letter makes no threats to include distributors in any lawsuit, but provides information about the relationship of Plaintiffs and Defendant. Such a letter also does not support Defendant's claims of deceptive trade practices. Moreover, under the Noerr-Pennington doctrine, the filing of the lawsuit alone cannot be the basis for liability. See Datascope, 165 F. Supp. 2d at 936. For the reasons articulated above, counterclaim 4 must fail, and Defendant's MDTPA claim is dismissed.

Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaims is granted.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 45] of claims 1 and 2 of the '008 Patent is **GRANTED**,
2. Defendant's Motion for Summary Judgment [Docket No. 40] that its skis did not infringe any claims of the '008 Patent, and that claims 1 to 3 of the '008 Patent are invalid, is **DENIED**,
3. Defendant's Motion for Summary Judgment [Docket No. 40] that its skis did not infringe claim 1 of the '101 Patent is **DENIED**,
4. Defendant's Motion for Summary Judgment [Docket No. 40] that its skis did not infringe claim 8 of the '101 Patent is **GRANTED**,
5. Plaintiffs' Motion to Strike [Docket No. 63] is **GRANTED**, and
6. C&A's Motion for Summary Judgment on All of Defendant's Counterclaims [Docket No. 32] is **GRANTED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: July 23, 2003




FIG 1

FIG 5




FIG 6






FIG 8




FIG 9




FIG 1